Martin G. Molina, Calif. Bar No. 176934
185 West "F" Street, Suite 100
San Diego, CA 92101
Telephone:  (619) 232-0620
Facsimile:   (619) 234-5322
mmolinaesq@outlook.com
CJA Attorney for Defendant
Ricardo Orizaba-Zendejas (5)

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### (Hon. Dana M. Sabraw)

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.  23 CR 1684-DMS |
| Plaintiff, | **Memorandum of Points and Authorities in Support of Motions to --** |
| vs. | |
| RICARDO ORIZABA-ZENDEJAS (5), | **1) Suppress Evidence by Quashing and Traversing the 321 Yakima St. Search Warrant and Request for *Franks* Hearing;** |
| Defendant. | **2)  Suppress Evidence by Quashing the Cellphones' Search Warrants;** |
| | **3) Sever Defendants for Improper Joinder; and** |
| | **4) Sever for Prejudicial Joinder** |

1

# **Table of Contents**

I.     General Introduction ............................................................ 4
         Introduction re Fourth Amendment claims ........................... 5
         Introduction re Joinder claims ............................................ 7

II.    Statement of Facts Re Motions to Quash/Traverse ....................... 8

         The origins of the investigation .......................................... 8

         The interview of Hernandez and Murillo ............................. 10

         The investigation of the Yakima ranch ............................... 12

         The interview of ██████████ ................................... 14

         The first observation of Mr. Orizaba,
         *according to the affidavit* ............................................... 15

         The first observation of Mr. Orizaba,
         *according to the report prepared by the affiant* ................... 16

         The execution of the search warrant at
         the Naches Ave. residence ............................................... 16

         The ██████████████████,
         *according to the affiant* ............................................... 17

         Relevant aspects of the interview of ████████ *captured
         by the recording,* yet *omitted from the affidavit* ................. 18

         The interview of ██████████
         *according to the affiant* ............................................... 20

         The interview of ██████████, *captured
         by the recording, omitted from the affidavit* ....................... *20*

         The surveillance of 321 Yakima Street on
         January 15, 2023, *according to the affiant* ........................ *20*

         The *misrepresentations and omissions* about
         321 Yakima Street ........................................................ 21

23cr1684-DMS

Probable cause, according to the affiant .............................. 22

The execution of the search warrant ................................... 23

III.   Argument ............................................................................ 25

The Affidavit Did Not Provide a Substantial Basis for
Believing That 321 Yakima Street Was a Drug Stash House
for the DTO or That It Contained Firearms or
Evidence of the DTO's Activities ....................................... 25

The Court Should Conduct a *Franks* Hearing .............................. 34

The Good Faith Exception Does Not Apply ................................ 35

IV.   Statement of Facts Relevant to Motion to Quash
Cellphones' Search Warrant ............................................... 36

V.    Argument ............................................................................ 37

Each of the Cellphones' Warrant Was Not Supported
by Probable Cause and Was Overbroad .............................. 37

Probable Cause Argument ..................................................... 37

Overbroad Argument ........................................................ 38

VI.   Statement of Facts Relevant to Motions to
Sever Defendants for Improper Joinder .............................. 40

VII.  Argument ............................................................................ 45

Mr. Orizaba and Madrigal Were Improperly Joined
as Defendants Under Rule 8(b) ......................................... 45

VIII. Argument ............................................................................ 49

In the Alternative, the Trial Against Mr. Orizaba
Should Be Severed Under Rule 14
for Prejudicial Joinder ................................................... 49

IX.   Conclusion ........................................................................ 52

23cr1684-DMS

# I.

## **General Introduction**

Mr. Orizaba moves to suppress evidence by traversing and quashing the search warrant that authorized the search of his residence at 321 Yakima Street in Parker, Washington, on the grounds that it contained unsupported conclusions, and provable material misrepresentations that likely influenced the magistrate into finding probable cause where there was not. He also moves for a *Frank*s hearing on the grounds of the material misrepresentations and omissions contained in the affidavit.[1]

He further moves to suppress evidence by quashing the search warrants for his three cellphones, one which was seized during the search of his residence, and two from the Camaro driven by him, on the basis that the affidavit included only the bottom-line conclusions of the affiant without any of the supporting facts specific to Mr. Orizaba that would have allowed the magistrate to make the necessary probable cause determination as to each phone. Moreover, these warrants were overbroad.[2]

Aside from these Fourth Amendment motions, Mr. Orizaba moves to sever his trial from the codefendant, Benjamin Madrigal ("Madrigal") for improper joinder under Fed. R. Crim. Proc. 8(b) and in the alternative, under Rule 14 for prejudicial joinder.

///

///

---

[1] The defense believes that the granting of these suppression motions should have a dispositive impact only on Counts Fifteen and Sixteen, charging him with possession of firearms on February 8, 2023, as these were seized from 321 Yakima Street pursuant to the challenged search warrant.

[2] Because the underlying affidavits are the subject of a protective order, many of their references in this pleading are redacted for the public filing.

23cr1684-DMS

## Introduction re Fourth Amendment Claims

Some of the evidence that the government intends to use in its case in chief stems from the February 8, 2023, execution of a federal search warrant at Mr. Orizaba's residence.   The warrant application sought to establish probable cause to believe that the 321 Yakima Street premises would contain narcotics and firearms, including evidence of the murder of two cooperating members of Madrigal's drug trafficking organization ("DTO") and evidence of financial and other activities of the DTO.

In an attempt to establish the requisite threshold, the application summarized the investigation that led to the identification of the DTO, some of its members, and of vehicles tied to either members of the DTO or relatives of theirs. From there, the application sought to link Mr. Orizaba with the DTO in two ways, though misrepresentations and weak inferences.

Some of the misrepresentations included the identification of Mr. Orizaba as the triggerman behind the murders of Cesar Murillo ("Murillo") and Maira Hernandez ("Hernandez") by order of Madrigal.  Absent from the affidavit is that the identification was transmitted to the affiant in the form of an uncertain speculation.  Also, by misrepresenting that Mr. Orizaba was seen receiving an item covered by a blanket or towel from where he was then seen driving away employing counter-surveillance techniques.   Implying with this that the encounter was drug-related.  However, the description of these events is not accurate because the affiant knew that Mr. Orizaba was handed only a blanket. Moreover, the affiant provided no basis to justify his opinion that Mr. Orizaba drove from there employing countersurveillance driving techniques.  Also, by misrepresenting that 321 Yakima Street had exterior surveillance cameras in every corner of the structure in addition to two other cameras on a pole, which the affiant described as being typical of

23cr1684-DMS

drug traffickers.  However, the house had two cameras attached to the front of the residence, one on each corner, covering the curtilage and two on a pole covering the front parking area. The rest of the house's perimeter, one side of which was adjacent to an empty open lot, had none. Thus, undermining the assertion that the layout of the cameras was indicative of drug trafficking activities at the house.

The remaining bases present weak inferences, not enough to rise to the level of probable cause. Particularly, that on January 15, 2023, agents observed at the residence of Mr. Orizaba three vehicles previously seen at a ranch where back in September a search warrant led to the seizure of firearms.  And also, that in June of 2022, his brother, Jose Orizaba, was arrested after a police officer seized drugs from the car he was driving in Tulare, California.  The agents, however, did not have any particular, drug-trafficking-related information about 321 Yakima Street, Mr. Orizaba, nor any of its occupants.

Mr. Orizaba seeks the suppression of the evidence seized during the search of the premises and of its fruits by moving to traverse the warrant and requesting a *Franks* hearing on the grounds that the application contained *material* misrepresentations purporting to generate probable cause.  Mr. Orizaba also moves to quash the warrant on the grounds that the information contained in the application fails to establish probable cause to believe that Mr. Orizaba was a criminal associate of the DTO, nor that the house contained evidence of the DTO's activities.

During the search of 321 Yakima Street, the agents seized one cellphone ("Target Device One"), while during his arrest, they seized from the Camaro driven by him two cellphones ("Target Devices Two and Three"). The agents ultimately applied for and obtained warrants authorizing their

forensic search.    However, the affidavit for these warrants included only conclusions of the affiant about the practices of drug traffickers communicating with each other using cellphones.  But no specific facts about Mr. Orizaba from which the magistrate could make a probable cause determination about those specific phones. Moreover, the warrant was overbroad, allowing the search of all forms of storage within the cellphone for a period of a year and a half without presenting probable cause to search all those categories of storage.

## **Introduction re Joinder Claims**

Mr. Orizaba also moves to sever his trial from Madrigal's for improper joinder under Fed. R. Crim. Proc. 8(b) because the charges against Madrigal do not arise from the same acts as Mr. Orizaba's and there is only a tenuous overlap with some and none with others.  In the alternative, he moves to sever under Fed. R. Crim. Proc. 14 for prejudicial joinder because Madrigal is charged with multiple drug trafficking related crimes, including a drug conspiracy different from the one which he shares with Mr. Orizaba, continuing criminal enterprise, and money laundering. This will substantially burden the jury's ability to properly allocate the individual evidence as to the drug conspiracy specific to Mr. Orizaba, separate from Madrigal's drug trafficking crimes.  Moreover, the murder-related counts against Madrigal involving three victims, one of them an unborn baby, all in connection with his drug trafficking activities, will likely prejudice Mr. Orizaba in the eyes of the jury to the extent that it may impact their ability to evaluate the strength of the evidence against him in an impartial way.

The present memorandum addresses the legal merits of each motion in turn. Each section is preluded by a statement of facts relevant to the particular claim.

23cr1684-DMS

## II.

## __Statement of Facts Relevant to Motion to Quash/Traverse__ [3]

### __The origins of the investigation__

The investigation leading to this case began in the early fall of 2021 after drug seizures of three vehicles at the two San Diego ports of entries and of one vehicle at a Colorado highway. App. ¶¶ 9-10. Each of these vehicles shared a peculiar characteristic in that they all bore a fraudulent temporary California license plate and a false vehicle identification number ("VIN"). Further investigation into these vehicles led to the discovery of their true VINs and that each had been reported as stolen in the United States. Another common denominator was that each of these vehicles made their first recorded border entry into the United States with their fraudulent identifiers driven by the same person, identified as Adam Pena ("Pena"). *Id.* Cellphone downloads of the people arrested during the border seizures showed that they all had numerous contacts with a person identified as "Mr. T."[4] App. ¶ 13.

A forensic search of the GPS monitor of each phone seized during the border seizures referenced above revealed that two of these where at some point at two locations in Yakima, Washington: (a) 813 S. 10th Ave ("the 10th Ave. address") and (b) 207 S. 7th Street ("the 7th St. address"). App. ¶ 14. Utility and/or DMV records tied the 10th Avenue address to Zentlit Yareli

---

[3] The statement of facts is based on the factual averments contained in the application for the search warrant. References to the application are included as "App. ¶." The application is separately filed under seal as it is the subject of a protective order.

[4] "Mr. T" was later determined to be Madrigal.

23cr1684-DMS

Banuelos ("Banuelos") and the 7th Street address to Banuelos, Benito Madrigal (brother of Madrigal), and Raquel Madrigal (sister of Madrigal). *Id.*

Agents' investigation of Pena's vehicular entries revealed that he entered 68 different cars, all displaying fraudulent identifiers, through the ports of entries.  App. ¶ 17.  Six of these vehicles were captured by license plate readers outside an auto repair shop, Daniel's Tire Service, located in Figueroa Street in  Los Angeles. App. ¶ 19.  On January of 2022, a state-issued search warrant of the repair shop led to the discovery of four stolen vehicles, three of these with fraudulent temporary license plates and altered VINs.  The day of the search, the owner of the business, Daniel Soto ("Soto"), told law enforcement agents that he knew that the vehicles were stolen and that they were destined for a drug trafficking organization.   App. ¶ 21. During a later interview, Soto said that he had received a number of wired transfers from a woman he knew as "Sofia" who lived in Washington and on behalf of what he referred to as "the drug circle." App. ¶ 23.[5]

On March of 2022, agents interviewed Pena.  App. ¶ 18. Pena admitted to knowing that the 68 vehicles crossed by him were stolen and bore fraudulent temporary license plates and VINs. *Id.* He said that he was aware that the vehicles had been driven to Tijuana to be retrofitted with fictitious VINs and temporary license plate numbers. His job consisted in driving those vehicles back into the United States to Soto in Los Angeles. Pena also told the agents that Soto told him that the cars would be used to smuggle drugs. *Id.*

On June 24, 2022, California Highway Patrol officers in Tulare seized 151,000 fentanyl pills and two kilograms of cocaine from a blue Ford Raptor with Washington state plates driven by Jose Orizaba (Mr. Orizaba's brother)

---

[5] Sofia is Hernandez's middle name – Maira Sofia Hernandez.

23cr1684-DMS

and also occupied by Benito Madrigal (Madrigal's brother), following a traffic stop. App. ¶ 25. Benito's driver's license listed his address as the 7th Street address. *Id.* A search of Jose Orizaba's phone found several images of a white Chevy Silverado. Mr. Orizaba was listed as one of the phone's contacts, identified as "Riky." App. ¶ 26. But no indicia of Mr. Orizaba being involved with the drug trafficking activities of his brother.

The license plate query of the Ford Raptor listed the registered owner as Hernandez at her address, 502 S. 12th Street, Yakima. App. ¶ 25. Border records reflected that the vehicle was first crossed through a port of entry on November 9, 2021, by Pena. *Id.* During a later interview, Pena confirmed that he'd crossed the Ford Raptor for Soto. App. ¶ 24.

This was not the first drug seizure associated in some way with Hernandez. A year before, on June 19, 2021, Madrigal and Daniel Ponce ("Ponce") were arrested in Medford, Oregon following a traffic stop that resulted in the seizure of multi-kilo amounts of methamphetamine. App. ¶ 28. Both of them confessed to knowingly transporting the drugs with Yakima as their intended destination. *Id.* A search of Ponce's phone led to the discovery of an image of a wired-money receipt naming Hernandez as the sender. *Id.* Ponce identified Hernandez as his girlfriend. *Id.*

Further investigation into a database of wire transfers, led to the identification of 33 wire transfers from Hernandez, from May 5, 2021 to August 2, 2022, with seven of those to individuals who coordinated the movement of stolen cars and/or drugs. App. ¶ 30.

**The interview of Hernandez and Murillo**

On June 30, 2022, HSI agents met with Hernandez to inquire about the Ford Raptor registered on her name involved in the June 24, 2022 drug

23cr1684-DMS

seizure and arrest of Jose Orizaba and Benito Madrigal in Tulare, referenced above. App. ¶ 27.  She said that she purchased the vehicle in February of 2022 from someone off Facebook but then sold it on May 23 to someone in Toppenish, Washington. App. ¶ 27.

On August 23, 2022, HSI agents met again with Hernandez at her residence. App. ¶ 31. There, they saw a blue GMC Sierra 2500 ("the blue GMC Sierra") with Washington plates registered on her name which she said belonged to her boyfriend, Cesar Murillo ("Murillo").[6] At the agents' invitation, the interview was continued at the office of HSI. *Id.* There, Hernandez said that she wired money to numerous people at the request of a man identified as "Shorty" and that she was paid between $50 and $100 per transfer. App. ¶¶ 32-33. She explained that she got involved with this illicit activity after meeting her former boyfriend, Ponce who directed her to wire money to him and others. App. ¶ 32.  After his arrest, she continued to wire money to different people at the direction of "Camaron." App. ¶ 33.

Regarding the Ford Raptor, Hernandez confessed that she lied to the agents when they first interviewed her about it. App. ¶ 34. She said that she got the vehicle from Shorty and that it had temporary California plates at the time.  Shorty provided her with ownership title and a purchase agreement though she did not pay for the vehicle.  After some time, Shorty asked for the Ford Raptor and paid her $20,000 – agents later confirmed via a database that she had deposited that sum of money in her bank account. *Id.*  Hernandez also said that Murillo was her current boyfriend.

---

[6] Not too long after, agents learned that the Sierra's VIN was fraudulent. App. ¶ 43.  The Sierra had been reported stolen on September of 2021. A search of CBP records reflected that the Sierra first made entry into the United States on January 14, 2022, driven by Margarito Meza, an employee of Daniel Soto. He'd received wire transfers from Hernandez and her boyfriend Cesar Murillo. *Id.*

23cr1684-DMS

The next day, Hernandez met with the agents again. App. ¶ 36. In that meeting, she allowed the agents to inspect and download her cellphone. There, the agents spotted a photo of Murillo holding a rifle while standing in front of the blue GMC Sierra. The metadata of the photo identified the coordinates of the site which corresponded to that of a ranch in the rural outskirts of Yakima County ("the Yakima ranch"). *Id.*

The download of her cellphone revealed among other things, images of people suspected of being associated with the DTO, images of cars with no license plates, images and videos of Hernandez and Murillo holding firearms, images of wire transfer receipts and bank account information, and an image of the death certificate of Gilberto Ortiz identifying Banuelos as his spouse. App. ¶ 44.[7] At the agents' request, Hernandez called Murillo, who in turn agreed to meet with the agents that day and to bring the blue GMC Sierra. App. ¶ 38.

As promised, Murillo arrived at the HSI office driving the blue GMC Sierra. App. ¶ 39. Murillo said that Shorty gave him the vehicle and that he never paid for it. App. ¶ 40. He also said that at Shorty's request, he sent wire transfers to others. During the interview, Murillo gave discrepant answers to the agents' questions about his involvement with stolen vehicles and wire transfers. *Id.* At the end of the interview, Murillo agreed to leave the blue GMC Sierra with the agents. App. ¶ 41.

## The investigation of the Yakima ranch

The agents' title investigation of the Yakima ranch revealed that it was registered to Banuelos. App. ¶ 45. Utility companies' records associated

---

[7] Gilberto Ortiz ("Ortiz") is the late spouse/significant-other of Banuelos. The certificate reflected an address of 110 E. Elizabeth St., Wapato as their place of residence and of his death.

23cr1684-DMS

Banuelos with the 10th Ave. address, while Washington DMV records tied her to 7th St. address.[8]  App. ¶ 46. A property just east of the ranch was registered to Banuelos, the property directly north was titled to Gilberto Ortiz ("Ortiz") (Banuelos' spouse), and one directly south to Ruperto Munguia, who was linked to Banuelos through other means. App. ¶¶ 47, 48.

On August 25, 2022, HSI agents engaged in surveillance of the Yakima ranch. There, they observed four RVs and four vehicles, specifically, (a) red Nissan pickup truck, (b) a Cadillac SUV, (c) a white Mercedes Benz sedan, and (d) a white Chevy Silverado. App. ¶ 51.

On September 8, 2022, HSI agents in conjunction with the Yakima Police Department executed a federal search warrant on the Yakima ranch. App. ¶ 54. Inside two trailers they found and seized digital scales, wrapping materials, money counting machines, and packaging paraphernalia associated with drug trafficking. App. ¶ 56. Throughout the parcel property, agents seized 30 assault rifles, nine handguns, fentanyl pills, currency and a Mexico vehicle purchase agreement with the identical format as those seized from the four seized stolen vehicles used in the transportation of drugs. App. ¶ 54. The purchase agreement was for an Infiniti with a VIN number that came back as registered to Carina Madrigal at the 7th Street address. *Id.*

Inside the white Chevy Silverado, they seized an AR-15 assault rifle with a fully loaded magazine and a bundle of currency in the glove compartment. App. ¶ 55.  The vehicle itself was not seized.[9]

---

[8] These are the two addresses pinged by the phones seized from couriers following border drug seizures from stolen vehicles, as described earlier. Ante at 8-9.

[9] This vehicle was connected to Jose Orizaba, Mr. Orizaba's brother who was arrested on June 22, 2022 in Tulare, California, as described earlier. An inspection of Jose Orizaba's cellphone led to the finding of photos of the vehicle. The affidavit correctly notes that the registered owner was Bridgette Esmeralda Orozco. App. ¶ 67. It identifies her as being the significant other of "ORIZABA", an apparent

23cr1684-DMS

**<u>The interview of</u>** ███████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████

On September 20, the agents conducted physical surveillance of the residence at  110 E. Elizabeth St. (the address identified in Ortiz's death certificate) App. ¶ 57. There, they saw the Infiniti described in the Mexico purchase agreement found during the search of the Yakima ranch on September 9. App. ¶ 58. The Infiniti carried a Washington license plate which as related above was registered to Carina Madrigal at the 7th Street address. *Id.*  The following day, the agents secured and executed a search warrant authorizing the surreptitious placement of a GPS tracking device on the Infiniti. App. ¶ 62.

On September 26, the GPS tracking device signaled the movement of the Infiniti to 304B S. Naches Avenue ("the Naches Ave. property'). App. ¶ 63  There, agents saw a Charger registered to Juan Manuel Rangel ("Rangel").  This same name had appeared three years before in a pickup truck with a fraudulent VIN plate, driven into the U.S. by Pena. *Id.*

///

reference to Mr. Orizaba by the use of the *upper case* font.  This is not correct. She was the significant other of Jose Orizaba who was also the target of the protective order mentioned in the affidavit.

14

**The first observation of Mr. Orizaba, *according to the affiant***

On October 26, HSI agents conducted physical surveillance of the Naches Avenue property. App. ¶ 65.  There, they saw the Cadillac SUV (same one observed at the Yakima ranch a month before) with no plates (App. ¶ 66), a silver GMC Sierra that was previously seen in the download of Hernandez's cellphone and at the ranch (*Id.*), a Jeep Grand Cherokee registered to Bridgette Esmeralda Orozco, Jose Orizaba's former significant-other (App. ¶ 67), and a Honda Accord with a temporary tag that was previously seen in a Toyota parked at Hernandez's residence when the agents first interviewed her (App. ¶ 68).

According to the affiant, the agents saw what the affiant described as an "unknown Hispanic male"  working on what appeared to be the interior door panels of the silver GMC Sierra, parked in the driveway. App. ¶ 69.  At some point, the agents saw Mr. Orizaba arrive in a Chevy Malibu.  Mr. Orizaba got out of the Malibu and had a chat with this person in the driveway of the house.  They then walked to the trunk area of the Cadillac SUV from where the male retrieved "an unknown *item* wrapped in a towel or blanket" and gave to Mr. Orizaba. *Id.*

Then they both left  the property -- Mr. Orizaba driving the Malibu and the male driving the Cadillac SUV. App. ¶ 69.  They both got on northbound Highway 97 driving at "a high rate of speed" and then "abruptly exiting the freeway onto 5th Avenue or 2nd Ave.", which the affiant attributed to be indicative of "counter surveillance."  The affiant did not include any factual bases other for this conclusion other than driving fast.

///

///

///

23cr1684-DMS

**The first observation of Mr. Orizaba _according to the report prepared by the affiant._**

Notably, the written HSI report also authored by the affiant and dated January 23, 2023, describes the hand over as that of a "blanket," not of "an unknown _item_ wrapped in a towel or blanket." Specifically, his report states: "[The male] removed a _blanket_ from the rear of the vehicle. He handed _the blanket_ to Ricardo Orizaba who placed _the blanket_ into the rear of the Chevy Malibu."[10]

**The execution of the search warrant at the Naches Avenue residence**

Two days later, on October 27, the agents executed a search warrant on the Naches Avenue property. They found "gold plated money counting machines" along with wire transfer paperwork, and a fictitious work permit card on the name of Benito Madrigal. App. ¶ 71.

However, according to the report prepared by the affiant, _one_ money counting machine was found. None of the items found were seized.[11]

The agents interviewed the occupants, Raquel and Carina Madrigal. According to the affiant, both sisters denied but later admitted to being the siblings of Benito and Madrigal. _Id._ However, according to the report authored by the affiant, only Raquel initially denied being a sibling of them, Carina did not conceal their identities.[12] Furthermore, she told the agents that the Infiniti was owned by Banuelos who purchased it from Murillo.

---

[10] Discovery Round 6 Reports-004428.

[11] Discovery Round 6 Reports-004429.

[12] _Id._

23cr1684-DMS

1 | The ████████ interview of ████████ *according to the affiant.*



24 ///
25 ///
26 ///

17

23cr1684-DMS

**Relevant aspects of the interview of ███████████ *captured by the recording, yet omitted from the affidavit.*** [13]

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████ ███████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████ ██████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

████████ ████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

---

[13] See Declaration of Investigator Hector Rivera.

23cr1684-DMS



27 ///

23cr1684-DMS

**The Interview of** ████████████, *according to the affiant*

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**The interview of** ████████████**,** *captured by the recording, omitted from the affidavit.*[14]

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**The surveillance of 321 Yakima Street on January 15, 2023, according to the affiant.** [15]

████████████████████████, the agents established surveillance of Mr. Orizaba's residence at 321 Yakima Street.[16]  There they saw the Chevy Malibu parked in its driveway. App. at ¶ 85.  They also saw three cars that

---

[14] See Declaration of Investigator Hector Rivera.

[15] See Declaration of Investigator Hector Rivera.

23cr1684-DMS

were previously seen five months before at the Yakima ranch (the white Chevy Silverado from where a rifle was seized, a Mercedes Benz, and a red Nissan pickup truck), one of which was seen three months before at the Naches Avenue residence (the red Nissan pickup truck).  App. at ¶ 86.

According to the affiant, the house had a security camera on each of its corners. App. ¶ 87.  The affiant also described the presence of two cameras on a pole.  App. ¶ 87.  According to the affiant, these cameras were positioned to view Yakima street, one facing north and the other facing south, and that the presence of cameras at the house was consistent with the practices of drug traffickers.

**The *misrepresentations and omissions* about 321 Yakima Street**[17]

The affiant's statement that the house had a camera in each corner was a material misrepresentation.   The house had two cameras attached to its structure --  one on the northwest corner of the structure (to the left when facing the house from the Yakima Street), and another on the southwest corner (to the right when facing the house).  The one to the left faces a grassy area on its front yard behind the fence, while the one to the right faces the driveway and an RV parked on it.   Those are the only cameras attached to the structure. The house sits next to an empty, open lot to its north. Yet, the house had no cameras facing that area. Nor cameras in the rear backyard area of the house, nor in the area adjacent to the next door neighbor to its south.

---

[16] According to the affiant, they found this residence by driving around the area between the 5th Avenue and 2nd Avenue off-ramp from U.S. Highway 97, the suspected exit taken by the Chevy Malibu and the Cadillac SUV after leaving the Naches Avenue premises. App. ¶ 85.

[17] See Declaration of Investigator Hector Rivera; Declaration of Leonardo Orizaba.

23cr1684-DMS

1    The house had two other cameras attached to a four-by-four wooden
2  pole standing midway behind the front fence, with one camera attached to
3  its right (when facing from Yakima Street) looking down at the gate of the
4  driveway and the curb and one to its left looking down at the fence and the
5  curb. The pole also had a sign identifying the address.

6

7  **Probable cause, according to the affiant**

8    The affiant determined that there was probable cause to believe that a
9  search of 321 Yakima street would reveal the presence of narcotics and
10 firearms. App. ¶ 90. He based this belief on several purported reasons:

11    • ██████████████████████████████████████
12      ██████████████████████

13    • Mr. Orizaba being the brother of Jose Orizaba who was arrested
14      on June of 2022 transporting a load of drugs. App. ¶ 97.

15    • The purported counter-surveillant nature of Mr. Orizaba's
16      driving, three months before after he left the Naches Ave.
17      residence in the Chevy Malibu. App. ¶¶ 88, 97

18    • The presence of security cameras at Mr. Orizaba's residence,
19      consistent with the practice of drug traffickers. App. ¶ 88.

20    • The finding of "money-counting machines" and wired money
21      receipts at the Naches Avenue residence on October 28. App. ¶
22      97.[18]

23

24

---

25  [18] The affidavit refers to "the discovery of money counting machines." App. ¶ 97.
26  As indicated earlier in this memorandum, the search of that location led to the
    discovery of one money counting machine, as per the report prepared by the
27  affiant. This is a reflection of a pattern of misrepresentations present in other
28  more material sections.

23cr1684-DMS

- And, the presence of vehicles at 321 Yakima Street that were previously seen at the Yakima ranch five months before (Chevy Silverado (found to have a rifle), Mercedes Benz, and Nissan pickup truck) five months before and at the Naches Avenue residence three months before (Nissan pickup truck).

## The execution of the search warrant

On February 8, 2023, federal agents executed the search warrant at Mr. Orizaba's residence. Prior to its execution, they observed Mr. Orizaba driving away from the property driving a Camaro.  An agent followed Mr. Orizaba and ultimately detained him while the other agents proceeded to execute the warrant.    During the detention, Mr. Orizaba purportedly consented to the search of the Camaro. Inside, the agents found two cell phones, ammunition, and firearm magazines, as well as a container of marijuana under the driver's seat.

Agents executing the search warrant found inside one of the rooms, 11 baggies consisting of 1.33 kilograms of fentanyl pills. Located underneath was currency and fraudulent Social Security and Permanent Resident cards in the name of Mr. Orizaba.  Propped up in the corner of this room was an AR-15 rifle with a scope and a drum magazine with ammunition Next to the rifle was a black backpack with three bags of heroin weighing 1.75 kilograms. Also found elsewhere in the room was a cell phone with a pink case,  magazines,   body armor, and an electronic money counter, among other items.[19]

---

[19] This cellphone was identified in the cellphone search warrant application as Target Device One.

23cr1684-DMS

Inside another room, the agents found a Polymer 80 9mm handgun with an attached suppressor and an extended magazine. In addition, the agents located an AR-15 upper 50 Cal AMT Automag 5 handgun with magazines, a Winchester 22 rifle, various caliber ammunition, cash, and suspected fraudulent identification documents.

Inside a third room, the agents seized a Ruger 10-22 rifle with magazine and ammunition. Inside a vehicle parked in front of the house, the agents found an additional rifle. From an RV parked in the driveway, the agents seized ammunition magazines and a Ford Raptor key fob. From a safe, the agents retrieved a handgun with a magazine and ammunition, and six baggies consisting of 1.06 kg of fentanyl powder. Following these seizures, Mr. Orizaba was placed under arrest. From the interior of the Camaro, the agents seized two cellphones.[20]  After his arrest, he was taken to a detention facility from where he placed a recorded call to his sister.

Through these motions to quash and traverse, Mr. Orizaba seeks the suppression of all items seized from the 321 Yakima Street residence on the grounds that the warrant authorizing the search was not premised on probable cause and that it contained material misrepresentations and omissions. He also seeks the suppression of all evidence derived from the search, including the observations of the agents during his detention and arrest, the seizures from the Camaro, from the execution of the search warrants on the three cellphones, and of the recorded phone call that he placed from the jail after his arrest, as the improper fruits of the unconstitutional search of 321 Yakima Street.

---

[20] The agents later obtained search warrants for the three seized cellphones (one from the property and two from the car). The constitutionality of these is discussed in a further section of this memorandum.

# III.

## Argument

### The Affidavit Did Not Provide a Substantial Basis for Believing that 321 Yakima Street was a Drug Stash House for the DTO or that it Contained Firearms or Evidence of the DTO's Activities.

The Fourth Amendment to the U.S. Constitution states, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV.

"Probable cause for a search requires a fair probability that contraband or evidence of a crime will be found in a particular place, based on the totality of the circumstances." *United States v. Grant*, 682 F.3d 827, 832 (9th Cir. 2012) (internal quotation marks omitted). "A reviewing court should find that probable cause is not met when the issuing judge lacked a substantial basis for concluding that probable cause existed." *United States v. Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013) (citations and quotations omitted). A court "may determine that a warrant was invalid where the magistrate's probable-cause determination reflected an improper analysis of the totality of the circumstances." *United States v. Elmore*, 917 F.3d 1068, 1074 (9th Cir. 2019) (holding that warrant for cell phone location information was not supported by probable cause) (internal quotations omitted).

"For probable cause, an affidavit must establish a *reasonable nexus* between the crime or evidence and the location to be searched." *United States v. Crews*, 502 F.3d 1130, 1136-37 (9th Cir.

23cr1684-DMS

2007)(emphasis added); *United States v. Chavez-Miranda,* 306 F.3d 973, 978 (9th Cir.2002) (same).  Here, it means that the affidavit must present a nexus - one that is reasonable (i.e. not based on mere conjecture) - between the activities of the DTO and 321 Yakima Street.

Mr. Orizaba acknowledges that in our circuit, "[n]ormally, we do not flyspeck the affidavit supporting a search warrant through de novo review; rather, the magistrate judge's determination should be paid great deference." *United States v. Kelley*, 478 F.3d 1068, 1072 (9th Cir. 2007)(cleaned up).  However, given the material factual omissions and misrepresentations by the affiant noted above, this Court should conduct its own independent review. *See Kelley*, *Id.* ("We have no way of telling the extent to which the excised portion influenced the magistrate judge's determination. Therefore, we will review his determination without particular deference. ")

As explained in greater detail below, the facts known at the time of the application were not sufficient to show a "fair probability" that evidence of drug trafficking or firearms would be found at 321 Yakima Street. That is, there is an absence of *reasonable nexus* between the property and the drug trafficking crime under investigation.

First, the assertion connecting Mr. Orizaba with the murders at the Yakima ranch is a non-starter. This was a knowing misrepresentation by the affiant geared to generate probable cause in the mind of the magistrate judge. ████████████████████████████████████████████

23cr1684-DMS

1 ██████████████████████████████████████████████████

2 ████████████████████████

3      Second, the purported suspicious activities of October 26, 2022 at the

4 Naches Avenue residence rest on false assumptions.  First, in the affidavit,

5 the affiant described the hand-over as that of an "item" covered by a blanket

6 or a towel.  This was a misrepresentation.  As described above, in a report

7 authored by the affiant, he reported that he saw Mr. Orizaba receiving a

8 "blanket" from the unidentified person. The misrepresentation contained in

9 the affidavit about an "item" being "covered" by a towel or a blanket created

10 the false suspicious impression that criminal activity, i.e. hand-over of drugs,

11 was taking place.  The Naches Avenue residence was not a known source of

12 drugs (no drugs were found during the search just two days later) and the

13 Cadillac SUV was not observed coming from a known source of supply.  The

14 house was found to have one currency counting machine, but Mr. Orizaba

15 did not enter the house, and all he got was the blanket retrieved from the

16 Cadillac SUV.[21]  One last point about this surveillance – the observation of

17 the man working on the door panels of the GMC Sierra. App. ¶ 69. There is

18 no connection between that activity and the hand-over.  Moreover, there is

19 no allegation that the prior vehicular drug seizures mentioned in the

20 affidavit involved drugs concealed inside door panels.

21

22 ─────────────────────

23 [21] Even with the assumption that Mr. Orizaba did receive an item covered by a

blanket, probable cause is not met for much is left to conjecture. *See United States*

24 *v. Underwood, supra,* 725 F.3d at 1083, where the Ninth Circuit "afford[ed] little to

no weight" to an affiant's statement that, "'[b]ased on other seizures in this

25 investigation, I believe the crates [he saw defendant deliver] contained

approximately 260,000 pills of MDMA." The court found the statement to be "a

26 bare conclusion because it provides no underlying facts about the seizures from

which the issuing judge could draw his or her own conclusions about how, if at all,

27 the seizures indicate that the two crates contained ecstasy." *Id.*

28

Furthermore, the purported countersurveillance driving was a conclusion with insufficient facts – driving northbound on Highway 97 over the speed limit for the short distance between Wapato and Parker, and quickly exiting through one of the two highway's exits to the small town of Parker.[22]   *See Underwood, supra*, at 1081 ("Conclusions of the affiant unsupported by underlying facts cannot be used to establish probable cause.").   Having cleaned this purported basis, the Court is left with the observation of someone in the front of the residence working on the interior door panels of a vehicle, Mr. Orizaba arriving, visiting with this person in the front area of the residence, then walking with him to retrieve a blanket from a Cadillac SUV, and then both of them leaving in their cars in the same direction, northbound on Highway 97, driving faster than the speed limit, and then exiting into one of the two streets that access the small town of Parker, where 321 Yakima Street is located.

Third, that Mr. Orizaba is related by blood to Jose Orizaba – his brother, who was arrested on June of 2022 in Tulare, California transporting fentanyl in the Ford Raptor – says nothing about 321 Yakima Street nor Mr. Orizaba.   There is no criminal connection between the drug trafficking activities of Jose Orizaba *seven months* before and 321 Yakima Street nor Mr. Orizaba to justify this being a factor at all in the analysis.[23] *See United States v. Grant*, 682 F.3d 827, 837 (9th Cir. 2012)(rejecting family association as a basis for probable cause); *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1085 (9th Cir. 2011) (generalized statements in affidavit that it is common for families of gang members to assist other members of the gang

---

[22] See Declaration of Investigator Rivera for a description of the travel from Wapato to Parker.

[23] Jose Orizaba's phone was found at the time to have communications with Mr. Orizaba. But no allegation that these were criminal in nature. App. ¶ 26.

23cr1684-DMS

was insufficient to support probable cause to search the home of gang member's family).

Fourth, the conclusion about the property's household security cameras being consistent with that of drug traffickers does not hold water. The house had four household security cameras – two attached to each end of the front of the structure, with one covering the driveway, and the other, the front grassy area, and two others attached to a pole in the middle section behind the front fence, pointing to the area adjacent to the fence. The house did not have a camera on every corner of the structure as otherwise affirmatively represented by the affiant. Everywhere else around the perimeter of the house was clear of any cameras. This is not consistent with the practices of drug traffickers, even more so, when the side of the house adjacent to an empty open lot accessible by anyone did not have any surveillance. The omission of these facts by the affiant speaks volumes, because they undercut the affiant's conclusion that the property's positioning of cameras reflected surveillance practices employed by drug traffickers.

Lastly, the presence of the three vehicles namely, (a) the red Nissan pickup truck, (b) the white Mercedes Benz sedan, and (c) the white Chevy Silverado (from which a firearm was seized back in September at the ranch), does not bring cause to believe that drugs, guns, or evidence of drug trafficking would be found there, as discussed below.

Specifically, the red Nissan pickup truck was first observed five months before during the surveillance of the Yakima ranch (App. ¶ 51.) and then on October 28 at the Naches Avenue residence (App. ¶ 71), the day when the warrant was executed, with no drugs seized. No specific facts connect the observation of the vehicle at these locations to drug trafficking or to a particular known drug trafficker. It follows logically that the presence

23cr1684-DMS

of that vehicle at Mr. Orizaba's house three months after the Naches Avenue seizure and five after being spotted at the ranch says nothing about evidence of drug trafficking activities being kept at 321 Yakima Street. Essentially, the same argument goes for the Mercedes Benz sedan, which was previously seen on August 25 during the surveillance of the Yakima ranch. App. ¶ 51.

The white Chevy Silverado was previously seen at the Yakima ranch on August 25 (App. ¶ 51), and then during the September 8 execution of the search warrant there. App. ¶ 55. This search led to the seizure of a rifle with a loaded magazine and $600 in currency. *Id.* Several photos of this vehicle were seen during the review of Jose Orizaba's cellphone after his arrest on June of 2022, yet no allegation of a connection between those and a crime (App. ¶ 26). But these events many months before involving the Chevy Silverado cannot, absent more particular information, generate probable cause for 321 Yakima Street nor for any other property where the vehicle is parked.

The presence of these vehicles at 321 Yakima street could reasonably lead to the conclusion that the property has a relationship with the vehicles of some sorts. But is this sufficient to believe that evidence of drug trafficking would be found at the property? The answer to this question, as explained below, is no. This is not enough as the presence of these vehicles does not establish a reasonable nexus of criminal activity between the house and the DTO under investigation.

The focus of probable cause must be individualized, rather than based solely on one's relationship of an unknown type with others who may be suspected of crimes. It is well settled that a "person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois*, 444 U.S.

23cr1684-DMS

85, 91 (1979).  Bringing *Ybarra* to our case, 321 Yakima Street's and/or its occupants' propinquity to parked vehicles that were suspected to be connected at some point with people or another property under suspicion, likewise without more, cannot give rise to probable cause to search the premises for evidence of those suspected crimes.

In *United States v. Brown*, 951 F.2d 999 (9th Cir. 1991), federal law enforcement agents received information of a money-laundering investigative unit of the sheriff's department whose members were keeping money that was seized from drug traffickers. *Id.* at 1000.  The unit was sent to a hotel to meet with federal agents posing as drug traffickers seeking to launder large amounts of currency. *Id.* at 1001. On the day of the meeting, two of the unit members, Bauder and Gardner, waited for one of the supposed traffickers to leave the room, they then entered the room and took $30,000 in cash of marked money from an athletic bag. Later that evening, Bauder, Garner, Sobel, Brown and Kaliterna "detained" the purported money launderer and brought him to the room. *Id.* Once inside the room, Bauder, Garner, Sobel, and Brown gathered around a table which had the empty athletic bag, a sack containing $18,000, and a garment bag containing $45,000. Kaliterna was a slight distance away.  *Id.* Bauder took the sack with the money, displayed its contents to the other three and left the room with that money.  The stolen money was not booked into the Sheriff's Department as evidence, only $45,000.  Based on this, federal agents sought search warrants for the residences of each of the unit's members who participated in the operation.

The affidavits contained (1) information directly implicating certain members of the unit, but not Brown and Kaliterna, and (2) information from the operation in which Brown and Kaliterna were present. *Id.* The searches

23cr1684-DMS

of Brown's and Kaliterna's residences led to the seizure of currency connected to the operation. They moved to suppress the fruits of the searches, and the district court agreed, finding that the search warrants were not supported by probable cause and that the good faith exception did not apply. On appeal, and relevant to Mr. Orizaba's motion, the Ninth Circuit agreed that probable cause was lacking.[24]

On appeal, the government argued that because Brown and Kaliterna were members of a unit that was mostly engaged in corrupt practices, probable cause was met. *Id.* at 1002. The Court disagreed, reasoning that even though some of the members of the unit were engaged in criminal activity, the unit still had as a legitimate purpose the investigation of narcotics and money laundering crimes. As such, the unit was not wholly criminal to the extent that membership in and of itself would establish probable cause. *Id.*

Of particular relevance here, the Court held that the information in the affidavit was not particular as to Brown and Kaliterna being participants in the criminal activities:

> The affidavits show only that Brown and Kaliterna belonged to a narcotics unit that was the target of an investigation and sting operation, and that one member of the team took a sack of sting money out of a hotel room when Brown and Kaliterna were present. <u>There is no allegation in the affidavits that Kaliterna saw Bauder display the money and remove it from the penthouse room.</u> We are persuaded that the facts set forth in

---

[24] The Court of Appeals however found that the officers had an objective good faith belief in the validity of the warrant. For reasons discussed later in this memorandum, the good faith exception does not apply here.

23cr1684-DMS

1

2

        the affidavits did not provide a substantial basis
        for the magistrate's probable cause determination.

*Id.* at 1003 (emphasis added).

3

4

    *Brown*'s evaluation of the sufficiency of the affidavit compels the same result here. The affidavit attempts to tie 321 Yakima Street to drug trafficking activities by the presence of the three cars. Cars, which as explained above, had no articulable connection to crimes, except their presence at the Yakima ranch raid four months before with one of them, the Chevy Silverado, being found to have a rifle and $600 in its interior. Yet no information or even articulable suspicion as to who drove those vehicles to 321 Yakima Street, when, or for what reason enough to add to the probable cause and nexus calculus. The connection is even less when compared to that of Brown and Kaliterna because there, an actual crime took place in their presence. Here, on the other hand, the presence of those vehicles at 321 Yakima Street say nothing about whether a crime was even taking place.

    Excluding the provable falsehoods of the affiant's version ███████ ████████ of his description of the October 26 handover at the Naches Avenue residence, and of the layout of security cameras at 321 Yakima Street, the Court is left with observation of cars associated to the raid at the ranch five months before, with one of them found to have a rifle and $600, and one at the Naches Ave. house where a money counting machine and receipts of wired money was found at the house. The presence of these vehicles at 321 Yakima Street would have been food for thought in the investigation, warranting a closer look. But not sufficient to justify a search warrant. Not without (1) a basis indicating that one of its occupants was a drug trafficker. *See United States v. Chavez-Miranda*, 306 F.3d 973, 978 (9th Cir. 2002) ("in narcotics cases evidence is likely to be found where the dealers live.") Nor (2) any other evidence tying the house to the drug-

activities of the DTO. *See United States v. Rasco*, 2022 WL 17582206, at *3 (D.Mont., 2022) (in a counterfeit investigation, the defendant's "close ties" to his counterfeit passing neighbor, the defendant's possession of a printing device potentially capable of printing currency, and his past convictions for forgery and identity theft, not enough: "Knowledge that a neighbor the Defendant knows is committing a crime cannot be a substantial basis for a finding of probable cause and suggests guilt by association.")

## The Court Should Conduct a *Franks* Hearing

Affidavits in support of search warrants are afforded a presumption of validity. In order to challenge that validity, the United States Supreme Court in *Franks v. Delaware* required the following: (1) the challenger must present more than conclusory arguments for challenging the validity, accusations of negligence or innocent mistake are insufficient; (2) the challenger should point to the specific portions of the affidavit claimed to be false and submit a supporting statement of reasons for why the challenger believes those portions are invalid; and (3) the challenger must present an offer of proof in accompaniment of their allegations of falsehood or satisfactorily explain the absence of proof. 438 U.S. 154, 171-72 (1978). "[I]f these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Id.*

However, if the remaining information in the affidavit is not sufficient to support a finding a probable cause, the court may hold an evidentiary hearing on the matter. *Id.* The challenger need not present clear proof of intentional falsehood or omission to deserve a hearing on the matter, but the

23cr1684-DMS

challenger must make a substantial showing of those elements. *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985). After the hearing, if the court determines that the issuing judge was misled by information the affiant "knew was false or would have known except for [their] reckless disregard of the truth, then suppression is an appropriate remedy." *Id.* A statement is made with reckless disregard for the truth when the affiant displays a "high degree of awareness of probable falsity." *United States v. Senchenko*, 133 F.3d 1153, 1158 (9th Cir. 1998). A defendant may also challenge the validity of a search warrant for deliberate or reckless omissions of facts. *Stanert*, 762 F.2d at 781.

Mr. Orizaba submits that he has made the requisite showing of misrepresentations and omissions described at length above. Accordingly, the Court should hold a *Franks* hearing.

## The Good Faith Exception Does Not Apply.

"Suppression of evidence seized pursuant to a warrant unsupported by probable cause is not appropriate if the government relied on the warrant in 'good faith.'" *Grant*, *supra*, 682 F.3d at 836 (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)). "The burden of demonstrating good faith rests with the government." *United States v. Camou*, 773 F.3d 932, 944 (9th Cir. 2014). Several exceptions exist for this rule including and relevant to this case, when the issuing magistrate was misled by the affiant with false information. *Leon*, 468 U.S. at 923. The majority opinion in *Leon* at 922-923, made it quite clear that it was not the intention of the Court to disturb the thrust of *Franks*. The reason is simple - an officer cannot be said to have reasonable grounds to believe that a warrant was properly issued when the warrant is the product of material misrepresentations and omissions.

23cr1684-DMS

As described above, the affiant made provable material misrepresentations, including that Mr. Orizaba was directly implicated ██ ████████████████████████████████████████████████████ Coupled with that, the misrepresentations about the nature of the handover outside the Naches Avenue house and those about the layout of cameras at 321 Yakima Street. The number and degree of these reasonably leads to the conclusion that they were intentional.

Accordingly, the good faith exception is not available for the government and exclusion of the fruits of the search is the appropriate remedy.

## IV.

## Statement of Facts Relevant to Motion to Quash
## Cellphones' Search Warrant

As described above, during the execution of the search warrant and concurrent arrest of Mr. Orizaba, the agents seized three cellphones. One of these, identified as Target Device One, was seized from one of the rooms at 321 Yakima Street location and the two others, identified as Target Device Two and Target Device Three from the car occupied by him during the traffic stop. The affiant submitted an affidavit in support of all three applications.[25] This affidavit, essentially repeated the same factual allegations as the one for the 321 Yakima Street, including the misrepresentations described above about ██████ ███████████████ ████████████████████████████████████. In addition, the affidavit recounted the events in connection with the execution

---

[25] The warrant application for the cellphones is separately filed under seal because it is the subject of a protective order.

23cr1684-DMS

of the search warrant at 321 Yakima Street and with the arrest of Mr. Orizaba.

The affidavit did not include any facts about Mr. Orizaba's use of cellphones. The reference to cellphones came from the affiant who stated that in his experience, "there is probable cause to believe that [Mr. Orizaba] was using the Target Devices to communicate with others to further the importation of illicit narcotics into the United States."[26]    The affiant requested that the date-range of search go as far back to August 8, 2021 on the grounds that "[b]ased on my training and experience it is also not unusual for individuals such as [Mr. Orizaba] to attempt to minimize the amount of time they were involved in their smuggling activities."[27]   However, the affiant did not include a factual basis for this suspicion. In fact, the affidavit does not include reference to any statements that Mr. Orizaba might have made.

### V.

### Argument

### Each of the Cellphones' Warrant Was Not Supported by Probable Cause and Was Overbroad

### Probable Cause Argument

"[M]odern cell phones are 'minicomputers' with 'immense storage capacity" carrying "'a cache of sensitive personal information.'" *United States v. Cano*, 934 F.3d 1002, 1020 (9th Cir. 2019)(quoting *Riley v. California*, 573 U.S. 373, 393-97 (2014)). The Supreme Court in *Riley* thus held that police generally must obtain a warrant to search a cell phone. 573 U.S. at 403. And in doing so, "law enforcement and judicial officers must be especially

---

[26] Cellphones' warrant application at ¶ 29.

[27] *Id.*

23cr1684-DMS

cognizant of privacy risks when drafting and executing search warrants for electronic evidence." *United States v. Schesso*, 730 F.3d 1040, 1042 (9th Cir. 2013).

The affidavit did not establish probable cause to search the cell phones because it did not include *any* allegation that Mr. Orizaba had used *any* cell phones in connection with *any* of the suspected criminal activity.

Moreover, its allegations of the use of cellphones in connection with criminal activity were mere conclusions, without any supporting facts that would have allowed the magistrate to make the necessary independent judgment. *See Underwood*, *supra,* 725 F.3d at 1084, discussed above. Regarding the use of cellphones, the affidavit mentioned that based on the affiant's experience,   drug traffickers use cellphones to communicate amongst themselves.[28] But with no facts about Mr. Orizaba's use of cellphones, the affiant concluded that "[i]n light of the above facts and [his] experience and training" there was probable cause to believe that Mr. Orizaba was using the phones "to further the importation of illicit narcotics into the United States."[29]   This conclusion, with no factual backing is not enough.

**Overbroad Argument**

The warrant also was *overbroad*. The Fourth Amendment requires "probable cause to seize the particular things named in the warrant." *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 702 (9th Cir. 2009) (cleaned up). When a warrant identifies categories of evidence to be seized, it is overbroad unless there is probable cause "to seize all items of those

---

[28] Cellphones warrant application at ¶ 5.

[29] *Id.*

23cr1684-DMS

particular types." *Id.* at 705 (brackets and internal quotation marks omitted). In *United States v. Adjani*, 452 F.3d 1140, 1148 (9th Cir. 2006) for example, the Ninth Circuit held that a warrant to search the defendant's home was sufficiently specific because it both "limit[ed] the search for evidence of a specific crime" and "provided the 'precise identity' and nature of the items to be seized," such as "communications with three individuals or other employees or a specific company."

The warrant here authorized the search of the phones for categories of information that any cell phone is likely to contain, from August 19, 2021 to February 8, 2022: contact lists, phone logs, texts, voice mail, images and videos, audio files, applications and application files, call logs, geographic location data and data on any removable storage devices. However, none of the affidavit's paragraphs that were specific to the alleged illegal activity explained why there was probable cause to seize any of these categories of data. Several of the affidavit's generic training and experience paragraphs explain the capabilities of cell phones—that they can be used to send and receive calls, texts, audio and video, for example, or store application data or determine locations—but without any explanation of how these capabilities relate to evidence, contraband or this case. It did not give the searching officers any guidance about what particular data within these broad categories might be connected to criminal activity and they thus would be authorized to seize. Instead, it opened up the three cell phones to undirected rummaging at the officers' complete discretion. For this reason, the cellphones' warrant was overbroad and thus, not in compliance with the Fourth Amendment's requirements.

///

///

23cr1684-DMS

# VI.

## Statement of Facts Relevant to Motion to Sever Defendants for Improper Joinder

The underlying 18-count superseding indictment charges the lead defendant, Madrigal, Mr. Orizaba, and others with a number of crimes. To better appreciate the joinder arguments, a breakdown of the charges is appropriate.

Specifically, as to **Mr. Orizaba**, the superseding indictment charges him with six counts:

- **Count Two:** (*Charged with Madrigal*) Conspiracy to distribute methamphetamine, fentanyl, and cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846. This is the only conspiracy charge against Mr. Orizaba.

- **Count Ten:** August 28 and September 2, 2022 – (*Charged with Madrigal*) - Knowingly and intentionally using the threat of physical force to (a) prevent the testimony of *John Doe* in connection with federal criminal proceedings in the present case and other cases in our district and to (b) prevent his communication with federal agents from Homeland Security Investigations, in violation of 18 U.S.C. §§ 1512(a)(2)(A), (C), (3)(A), and 1111.

    - This charge stems from the allegation that on August 28, 2022, after the murder by another (others) of Cesar Murillo ("Murillo") at a ranch in Yakima, Washington ("the Yakima ranch"), "Mr. Orizaba stood next to Madrigal brandishing a rifle while Madrigal ordered silence about what they had

23cr1684-DMS

seen and threatened retribution against anyone who spoke of Murillo's murder."[30]

- **Count Eleven:** August 28, 2022 – (Charged alone) - Accessory after the fact to the killing of Murillo, as charged in Count Eight against Madrigal, in violation of 18 U.S.C. §§ 3, 1512(a)(1)(A).
    - This charge stems from the allegation that on August 28, 2022, Mr. Orizaba and others buried the remains of Murillo at the Yakima ranch.

- **Count Thirteen:** August 8, 2022 – (Charged with Madrigal) Using, carrying, and brandishing a firearm – *during* and *in relation to*
    - (a) a crime of violence, as charged in Count Ten [threatening of John Doe], and
    - (b) a drug trafficking crime, as charged in Counts One [charged only as to Madrigal], Two [Mr. Orizaba's drug conspiracy], and Three [charged only as to Madrigal],
    in violation of 18 U.S.C. § 924 (c) (1) (A) (iii)).[31]

---

[30] See Government's response to Mr. Orizaba's motion for bill of particulars, ECF 90, page 19, lines 8-12.

[31] Mr. Orizaba is not charged in Counts One and Three. Count One charges Madrigal with engaging in a continuing criminal enterprise in violation of 21 U.S.C. §§ 848(a) and (b)(2). Count Three charges Madrigal and others with conspiracy to import various drugs, in violation of 21 U.S.C. §§ 952, 960, and 963. Thus, as to Count Thirteen, only the reference to Count Two is relevant to Mr. Orizaba.

23cr1684-DMS

- **Count Fifteen:** February 8, 2023 – (Charged alone) Possession of a firearm – *in furtherance of a drug trafficking crime* as charged in Count Two, in violation of 18 U.S.C. § 924 (c) (1) (A) (i).

- And, **Count Sixteen:** February 8, 2023 – (Charged alone) Possession of a firearm, with a silencer – *in furtherance of a drug trafficking crime*, as charged in Count Two, in violation of 18 U.S.C. § 924 (c) (1) (B) (ii).[32]

**Madrigal**, on the other hand, is charged on 15 counts, three of which he shares with Mr. Orizaba as indicated out above. His other 12 counts are-

- ❖ **Count One:** Engaging in a Continuing Criminal Enterprise, based on violations of the Controlled Substances Act, including those charged in Counts Two and Three, in violation of 21 U.S.C. § 848 (a), (b)(2).

- ❖ **Count Three:** Conspiracy to import methamphetamine, fentanyl, and cocaine, in violation of 21 U.S.C. §§ 952, 960, and 963.

- ❖ **Count Four:** Knowing and intentional killing of Cesar Murillo while engaged in the crime of conspiracy to import, distribute, and possess with intent to distribute methamphetamine, fentanyl, and cocaine, in violation of 21 U.S.C. § 848 (e).

---

[32] Counts Fifteen and Sixteen stem from the seizure of weapons during the February 8, 2023, execution of the federal search warrant at 321 Yakima Street.

23cr1684-DMS

❖ **Count Five:** Knowing and intentional killing of Maira Hernandez while engaged in the crime of conspiracy to import, distribute, and possess with intent to distribute methamphetamine, fentanyl, and cocaine, in violation of 21 U.S.C. § 848 (e).

❖ **Count Six:** Conspiracy to kill Cesar Murillo and Maira Hernandez and to threaten the use of physical force against Cesar Murillo and Maira Hernandez and John Doe to prevent their attendance and testimony at an official proceeding and to prevent their communication to a law enforcement officer, in violation of 18 U.S.C. §§ 1512(a)(1)(A), (C), (2)(A), § 1111, and § 1512(k).

❖ **Count Seven:** Knowing and intentional killing of Cesar Murillo to prevent his attendance and testimony at an official proceeding and to prevent his communication to a law enforcement officer, in violation of 18 U.S.C. §§ 1512(a)(1)(A), (C), (3)(A), and § 1111.

❖ **Count Eight:** Knowing and intentional killing of Maira Hernandez to prevent her attendance and testimony at an official proceeding and to prevent her communication to a law enforcement officer, in violation of 18 U.S.C. §§ 1512(a)(1)(A), (C), (3)(A), and § 1111.

23cr1684-DMS

❖ **Count Nine:** Causing the death of a child in utero (Maira Hernandez's unborn baby) while engaged in the conduct charged in Counts Five and Eight, in violation of 18 U.S.C. §§ 1841, 1111.

❖ **Count Twelve:** Knowingly use, carry, brandish, and discharge a firearm, by shooting Cesar Murillo, *during and in relation to*

▪ a crime of violence as charged in Counts Four, Six, and Seven, and

▪ a drug trafficking crime as charged in Counts One, Two, and Three,

in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), and (2).

❖ **Count Fourteen:** Knowingly use, carry, brandish, and discharge a firearm, by shooting Maira Hernandez, *during and in relation to*

▪ a crime of violence as charged in Counts Five, Six, and Eight, and

▪ a drug trafficking crime as charged in Counts One, Two, and Three,

in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), and (2).

❖ **Count Seventeen:** Knowing possession of a machinegun in furtherance of a drug trafficking crime as charged in Counts One, Two, Three, and Four.

❖ **Count Eighteen:** Conspiracy to conduct a financial transaction, by knowingly transferring the proceeds of drug trafficking with

23cr1684-DMS

the intent to promote of drug trafficking, in violation of 18 U.S.C. § 1956(h).

## VII.

## Argument

## Mr. Orizaba and Madrigal Were Improperly Joined as Defendants Under Rule 8(b)

Pursuant to Rule 8(b), "when multiple defendants are involved, joinder is improper unless all offenses arise out of the *same series of acts or transactions*." *United States v. Sarkisian*, 197 F.3d 966, 975 (9th Cir. 1999) (quoting *United States v. Martin*, 567 F.2d 849, 853 (9th Cir. 1977))(emphasis added). In considering whether a particular set of events constitutes a "series of acts or transactions," the Ninth Circuit has stated that the term "transaction" has a flexible meaning. *See United States v. Ford*, 632 F.2d 1354, 1371 (9th Cir. 1980), overruled on other grounds by *United States v. De Bright*, 730 F.2d 1255, 1259 (9th Cir. 1984) (en banc). In practice, the determination of whether multiple offenses joined in an indictment constitute a "series of acts or transactions" turns on "the degree to which they are related," *United States v. Satterfield*, 548 F.2d 1341, 1344 (9th Cir. 1971)(emphasis added), and whether there is a "'logical relationship' between the offenses." *Sarkisian*, 197 F.3d at 975-76 (emphasis added). "The purpose of rule 8(b) is to balance the need to avoid the potential prejudice that may result from joining multiple defendants for trial with the need to attain trial efficiency." *United States v. Martin*, 567 F.2d 849, 853 (9th Cir. 1977)

Mere factual similarity of events will not suffice; rather, there must be a "logical relationship . . . shown by the existence of a common plan, scheme, or conspiracy." *Ford, supra*, 632 F.2d at 1371-72. Alternatively, "[a] 'logical

23cr1684-DMS

relationship' may also be shown if 'the common activity constitutes a substantial portion of the proof of the joined charges.'" *Sarkisian*, 197 F.3d at 976 (quoting *United States v. Vasquez-Velasco*, 15 F.3d 833, 844 (9th Cir. 1994))(emphasis added). While each defendant need not be charged in every count of an indictment or have participated in every act to justify joinder, acts alleged to be part of the "same series" of transactions must "evince a more substantial relationship" than that required to meet the "same or similar character" test for joinder of offenses. *United States v. Adams*, 581 F.2d 193, 197 (9th Cir. 1978)(emphasis added).

The guidance provided by these pronouncements is that Rule 8(b) requires that the joined defendants' actions have a substantial, logical relationship to the extent that they reflect a common plan or scheme.  This is a more taxing requirement than the one for joinder of charges (for one defendant) under Rule 8(a) "which permits charges of same or similar character." *United States v. Roselli*, 432 F.2d 879, 898 (9th Cir. 1970).

In the present case, the government improperly joined Mr. Orizaba to Madrigal.   The transactions and events that form the basis for the conspiracy of Count Two and for the other charges against Mr. Orizaba, do not "constitute[ ] a substantial portion of the proof of the joined charges [against Madrigal]" (quoting from *Sarkisian*, *supra,* at 976) because proof of Madrigal's charges depend on proof (1) from other conspiracies and other conduct charged against Madrigal but not Mr. Orizaba, or (b) other acts attributed only to Madrigal, as explained below.

 For instance, in **Count One** Madrigal is charged with CCE, a crime that encompasses drug trafficking and related activities that far exceed the scope of the agreement with Mr. Orizaba charged in Count Two, essentially the operation and management of the entire drug trafficking organization.

23cr1684-DMS

While Count Two covers the purported drug distribution activities of Mr. Orizaba in the Yakima area, CCE covers a wider range of activities, from the border with Mexico all the way up to Yakima and elsewhere - activities beyond the common plan between Mr. Orizaba and Madrigal charged in Count Two.

**Count Three**, charging Madrigal with conspiracy to import methamphetamine, fentanyl, and cocaine, involves a different agreement with a different purpose and different participants. Again, not meeting the "substantial relationship" test.

**Counts Four through Nine** center around activities which do not include Mr. Orizaba: the planning of the murders and the murders of Murillo and Hernandez, and the resulting death of her unborn baby. There is absolutely no overlap between the charges against Mr. Orizaba and the series of violent acts and transactions surrounding these homicides.

Moreover, the drug trafficking allegations behind these murders and charges go beyond the drug conspiracy charge of Count Two against Mr. Orizaba. Specifically --

**Counts Four and Five**, the killings of Murillo and Hernandez. The government alleges in these that each murder was committed by Madrigal "while engaged in … conspiracy to *import*, *distribute*, and *possess with intent to distribute* [methamphetamine, fentanyl, and cocaine]." (emphasis added) The purposes of this conspiracy exceed Count Two's conspiracy to distribute charge against Mr. Orizaba. This is particularly troubling when the government need only prove that the motive for the killing was *related* to <u>any</u> of those drug conspiracies charged against Madrigal, not necessarily just the Count Two conspiracy against both. *See United States v. Desinor*, 525 F.3d 193, 201 (2d Cir. 2008) ("To convict a defendant of engaging in a

23cr1684-DMS

narcotics conspiracy resulting in murder (or engaging in a narcotics conspiracy while engaging in a conspiracy to murder) under 21 U.S.C. § 848(e)(1)(A), the government need only prove beyond a reasonable doubt that one motive for the killing (or conspiracy to kill) was related to the drug conspiracy.") *Cf. United States v. Jones*, 101 F.3d 1263, 1267 (8th Cir.1996) (construing § 848(e)(1)(A) as requiring the jury to find "a substantive connection between the killing and the [drug crime].")  Here, the government will seek to prove the relation element with evidence that Madrigal committed the two murders to stop them from cooperating with law enforcement and thus to protect <u>all</u> of his ongoing trafficking activities, not just the one he is charged with along Mr. Orizaba.  Borrowing language from *Sarkisian, supra*, 197 F.3d at 976, proof of the common activity between Mr. Orizaba and Madrigal (i.e. Count Two) will not "constitute a substantial portion of the proof of the[se other] joined charges."  Accordingly, there is no substantial relationship between the conspiracy charge of Count Two (and any of the other charges against Mr. Orizaba) and the drug-trafficking purposes behind the murders charged in Counts Four and Five to justify their joinder under Rule 8(b).

The same essential argument goes with a) **Count Six**, charging Madrigal with conspiring to kill or to threat the use of violence against Murillo and Hernandez to prevent them from cooperating and testifying, b) **Counts   Seven and Eight**, the killing of Murillo and Hernandez, respectively to prevent them from cooperating and testifying, and c) **Count Nine**, the resulting death of the baby expected by Hernandez.  These were threats and killings committed to prevent the disclosure of Madrigals' own drug crimes.  **Counts Twelve and Fourteen**, the use of a firearm *during and in relation to* (1) a crime of violence (by shooting Murillo and Hernandez,

23cr1684-DMS

respectively), and (2) a drug trafficking crime (as charged in Counts One, Two, and Three), bear no substantial relation because (1) Mr. Orizaba was not a participant in the crime of violence, and because (2) the drug-trafficking crimes allegations against Madrigal exceed the scope of the conspiracy of Count Two.

**Count Seventeen**, charging Madrigal with possession of a machinegun on April 4, 2023, in furtherance of drug trafficking activity, does not have a connection to Mr. Orizaba because he was in custody by that time, having been arrested two months before.

Lastly, **Count Eighteen,** which charges Madrigal with conspiracy to launder money, has a purpose which is wholly distinct from the conspiracy to distribute charged against Mr. Orizaba and thus bears no substantial relationship with it.

Because the charges against Madrigal do not arise out of the same series of transactions as Mr. Orizaba's, they were improperly joined as defendants under Fed. R. Crim. Proc. 8(b).    Accordingly, the charges involving Mr. Orizaba should be severed from the superseding indictment.

## VIII.

### <u>In the Alternative, the Trial Against Mr. Orizaba Should Severed Under Rule 14 for Prejudicial Joinder</u>

Rule 14 provides relief whenever a defendant may be prejudiced by joinder of defendants in an indictment or by joinder for trial altogether. *See United States v. Hernandez-Orellana*, 539 F.3d 994, 1001 (9th Cir. 2008). In exercising its discretion under Rule 14, a district court must consider four factors, including:

> (1) whether the jury may reasonably be expected to collate and appraise the individual evidence against each defendant; (2) the judge's diligence in instructing

23cr1684-DMS

> the jury on the limited purposes for which certain evidence may be used; (3) whether the nature of the evidence and the legal concepts involved are within the competence of the ordinary juror; and (4) whether [the defendants] could show, with some particularity, a risk that the joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."

*Id.*(quoting *United States v. Sullivan*, 522 F.3d 967,982 n.9 (9th Cir. 2008)).

Here, the jury will have a difficult time compartmentalizing the evidence against Mr. Orizaba vis a vis Madrigal.  Mr. Orizaba is charged with conspiring with Madrigal to distribute drugs in Yakima in Count Two

But Madrigal is also charged in Count Three with a different conspiracy - to import drugs.  Evidence of these two conspiracies will coalesce in the proof of several charges. Specifically, the CCE charge of Count One in which evidence of both will be introduced to establish the operation of a drug trafficking enterprise. Same with the murder charges of Counts Four and Five, requiring proof that the homicides took place "while engaged in … conspiracy to import, distribute, and possess with intent to distribute." The conspiracy to kill and to threaten of Count Six, as well as well as the murder charges of Counts Seven and Eight, will produce proof that an investigation of Madrigal's entire drug trafficking activities (not just the conspiracy with Mr. Madrigal) was taking place and that the victims were murdered to prevent their cooperation and testimony in connection with these. Count Twelve's use and brandish of a firearm during and in relation to the drug trafficking crimes charged in Counts One, Two, and Three, will also bring evidence of all of Madrigal's conspiracies, not just the one with Mr. Orizaba.  No doubt, the Court will instruct the jury properly.  But a lay juror will certainly experience serious difficulties

23cr1684-DMS

compartmentalizing the drug trafficking evidence of Count Two separate from that of the other more extensive drug trafficking conspiracies and activities charged against Madrigal, particularly since the drugs have the same origin.

Lastly, the murder-related charges against Madrigal associated with Counts Four through Nine will bring with them the risk that Mr. Orizaba may be denied a fair consideration of the evidence against him. The events tied to these charges are violent and understandably likely to elicit collective anger - the killing of a couple and of their innocent unborn baby because Madrigal wanted to protect his vast drug trafficking business and avoid apprehension. The aftermath of the murders will likely fuel these emotions - the disposal of their bodies with a backhoe in a desolate ranch in Yakima, with the intent that they never be found. The jury will see this as the acts of a drug trafficker willing to do anything. The jury may see in Mr. Orizaba's charged involvement a reflection of this, someone who would condone these killings as the necessary cost of doing business. This will likely prejudice him, possibly depriving him of the right to a fair and impartial consideration of the evidence against him.

///
///
///
///
///
///
///
///
///

23cr1684-DMS

# IX.

## Conclusion

For the foregoing reasons, Mr. Orizaba requests the Court to suppress the evidence obtained from the execution of the search warrant at the 321 Yakima Street residence, the execution of the search warrants on the three cellphones attributed to him, and to sever his trial from Madrigal's.

Dated:  February 21, 2025                    Respectfully submitted,
                                             Law Office of Martin G. Molina


                                             By: /s/ Martin G. Molina
                                             Martin G. Molina
                                             mmolinaesq@outlook.com
                                             CJA Attorney for Mr. Orizaba

23cr1684-DMS