ADAM GORDON
United States Attorney
STEPHEN H. WONG
ALEXANDRA F. FOSTER
Assistant U.S. Attorneys
CA Bar No. 212485/D.C. Bar No. 470096
United States Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-9464/6735
Email: Stephen.Wong/Alexandra.Foster@usdoj.gov

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RICARDO ORIZABA-ZENDEJAS (5),<br><br>Defendant. | Criminal Case No. 23CR1684-DMS<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Sentencing Date: May 28, 2026<br>Time: 9:30 a.m.<br>Before Judge Dana M. Sabraw |

Defendant Orizaba-Zendejas was an integral part of a violent drug trafficking organization (DTO), orchestrating drug purchases, moving drug money, selling drugs and enforcing compliance. Defendant is facing a mandatory minimum of 15 years, and the U.S. Sentencing Guidelines dictate a sentence of life. Defendant's conduct warrants nothing less.

## I

## PROCEDURAL BACKGROUND

Defendant was charged in an 18-count Superseding Indictment on May 22, 2024, with the following:

- Count Two (ORIZABA Jury Trial Count One): 21 U.S.C. §§ 841(a)(1) and 846, Conspiracy to Distribute Methamphetamine, Fentanyl, and Cocaine;

- Count Ten (ORIZABA Jury Trial Count Two): 18 U.S.C. §§ 1512(a)(2)(A), (C), (3)(A), Threat of Force to Prevent Attendance at an Official Proceeding and Conspiracy;

- Count Eleven (ORIZABA Jury Trial Count Three): 18 U.S.C. § 3 and 1512(a)(1)(A) and 21 U.S.C. § 848(e), Accessory After the Fact to Murder;

- Count Thirteen (ORIZABA Jury Trial Count Four): 18 U.S.C. § 924(c)(1)(A)(i) and 18 U.S.C. § 2, Use, Carry, Brandish, Discharge a Firearm During and in Relation to a Drug Trafficking Crime;

- Count Fifteen (ORIZABA Jury Trial Count Five): Possession of a Firearm Equipped with a Silencer in Furtherance of a Drug Trafficking Crime; and

- Count Sixteen (ORIZABA Jury Trial Count Six): 18 U.S.C. § 924(c)(A), (B)(ii) and 18 U.S.C. § 2, Possession of a Firearm Equipped with a Silencer in Furtherance of a Drug Trafficking Crime and Aiding and Abetting.

After a seven-day trial in February 2026, Defendant was found guilty of Counts Two and Fifteen in the Superseding Indictment (Counts One and Five on the Jury Verdict Form), and not guilty on Counts Ten, Eleven, Thirteen and Sixteen. A Presentence Report was filed on April 24, 2026, and this sentencing follows.

## II

## <u>FACTUAL BACKGROUND</u>

The Court witnessed the trial, and the Presentence Report ably summarizes the details related to this event. *See* PSR, ¶¶ 10-74. The Court heard testimony and saw exhibits, which reflected Defendant's vital and uncontested role in the DTO that murdered and buried Cesar Murillo and Maira Hernandez and their unborn child, to further their drug trafficking operations. The murders of Defendant's erstwhile colleagues and friends did not slow down Defendant's drug trafficking operations with co-Defendant Benjamin Madriga-Birrueta (1) (Madrigal). It was business as usual, including threats to murder others who challenged Defendant's drug operations. In sum, the Government lists the following uncontroverted evidence of Defendant's critical role in the DTO:

- Madrigal led the DTO starting in around April 2022, and Defendant became Madrigal's lieutenant. That relationship is clear not just because of the testimony of Julio Vargas (*see, e.g.*, Tr. Transc. 364 (Madrigal had Defendant tail a drug load, because Madrigal trusted Defendant); 369 (Madrigal "always used to say that Ricky was his favorite. Ricky here; Ricky there; Ricky this; Ricky that."); 370 ("[Madrigal] would tell [Defendant] to do something, and [Defendant] had to do it. So if [Madrigal] were to send [Orizaba] to collect some money or whatever, he was going to do it.") and Mario Castaneda, but also in the large number of text messages between Defendant and Madrigal discussing their drug dealing and gun running venture.

- Defendant linked his brother, Jose Orizaba-Zendejas, a.k.a. "Chuy," up with "Tony" (Madrigal) on May 15, 2022. Gov. Exh. 13-001. One month later, Jose and Benito Madrigal-Birrueta (Benjamin's brother) were stopped in a car with approximately 150,000 fentanyl pills (16.56 kgs.) and two bricks of cocaine (1,997 grams) linked back to the DTO. Gov. Exh. 26-005 (9).

- Defendant drove DTO money from Yakima to California. Tr. Transc. 363, 418.

- Defendant wired $2,500 to a man implicated in the DTO. Gov. Exhs. 19-001B (money wire to Abisai Mata); 04-019B (Madrigal texting a photo of a car registration in the name of Abisai Mata to a co-conspirator (Salas)).

- Defendant tailed a car loaded with drugs from Visalia, California to Yakima, "so that [the driver of the drug load] don't go off route, so they don't steal the material." Tr. Transc. 364, 416-417.

- Madrigal dispatched Defendant to Seattle after another member of the DTO was unable to collect money from a fentanyl buyer. Tr. Transc. 366-370.

- The load driver offers to "go over there with Ricky" to ensure that the drug delivery proceeded smoothly. Gov. Exh. 04-013 (Text Exchange between Madrigal and x2338 at 17).

*Sentencing Memorandum*

3

*23CR1684-DMS (5)*

- A month after the three murders linked to this DTO, Madrigal instructed Defendant to "Fuck them up and bury them" at the same Ranch where the victims had been buried. Defendant responded by asking for a name to follow up on Madrigal's order.  Gov. Exh. 04-006.

**Phone Messages between Defendant (509-367-4276) and Benjamin Madrigal-Birrueta (559-618-7361)**

| Date | Time (UTC) | From | To | Message |
|---|---|---|---|---|
| 11/23/2022 | 9:55:51 AM | Benjamin Madrigal-Birrueta | Ricardo Orizaba | [AUDIO TRANSLATION] No, well, also, those dudes should not be provoking that asshole, if they do, we set the whole fucking [UI] on fire. But no, yes, check that out tomorrow. |
| 11/24/2022 | 12:00:18 AM | Ricardo Orizaba | Benjamin Madrigal-Birrueta | Missed call |
| 11/24/2022 | 8:49:54 PM | Benjamin Madrigal-Birrueta | Ricardo Orizaba | [AUDIO TRANSLATION] Leave it connected, man. What was I going to say? Also, something else. See if you send the gringos to check over there, up there that thing with the shed, because I think some of those, other gringos are taking some of it, I don't know if it's them or not, but they are removing parts they shouldn't. If they go and see someone doing that, have them beat the fucking shit out of the one stealing them. If not, fuck them up and bury them there. |
| 11/24/2022 | 8:51:21 PM | Benjamin Madrigal-Birrueta | Ricardo Orizaba | [AUDIO TRANSLATION] I'm going to send you the picture of that dude, the one that, supposedly is, is selling that material. |

In the text exchange above, Madrigal is concerned that someone is stealing from them, so Madrigal texts Defendant for help. Madrigal asks Defendant to "send the gringos …. If they go and see someone doing that, have them beat the fucking shit out of the one stealing them. If not, fuck them up and bury them there." Madrigal



then texts a picture of the potential thief to Defendant:

Once Defendant reads the texts and gets the picture, Defendant asks: "What's his name, man? … I'm going to check it out to see who the fuck he is." And Madrigal responds with a name and an additional picture:

| 11/24/2022 | 8:54:10 PM | Ricardo Orizaba | Benjamin Madrigal-Birrueta | [AUDIO TRANSLATION]<br>What's his name, man? Ah, didn't you have his Facebook name? I'm going to check it out, to see who the fuck he is. |
| 11/24/2022 | 8:54:35 PM | Benjamin Madrigal-Birrueta | Ricardo Orizaba | Información del vendedor — Detalles del vendedor — Austin Hitchcock |
| 11/24/2022 | 8:54:39 PM | Benjamin Madrigal-Birrueta | Ricardo Orizaba | [AUDIO TRANSLATION]<br>This is his name. If not, I'm also going to look him up now, so when I get there, I can send him messages about meeting with him to buy from him and then get that motherfucker. Because, you know how you had told me that the gringo had seen someone going up there. |



| 11/24/2022 | 8:56:32 PM | Benjamin Madrigal-Birrueta | Ricardo Orizaba | |

- Defendant provided Madrigal with a new source of supply in Mexico, "G," on November 17, 2022. Gov. Exh. 04-012 (p. 3) (Defendant sends contact information for "G" to Madrigal.) Seen days later, on November 24, 2022, that same contact (now saved as "Ga" in Madrigal's phone) sends pictures and videos to Madrigal highlighting Ga's access to methamphetamine, fentanyl pills, cocaine. Gov. Exh. 04-018.

- Defendant, working with Madrigal, brokered several gun-for-drugs deals. *See e.g.,* Gov. Exhs. 04-005, 04-012 (Defendant sends multiple pictures of different guns and Defendant responds, "Offer him buttons [fentanyl pills] for that gun.) For example, in the text exchange in Government Exhibit 04-005, Defendant sends an image of a gun and ammunition to Madrigal:

| 11/17/2022 | 5:35:18 AM | Ricardo Orizaba | Benjamin Madrigal-Birrueta |  |

Defendant adds, "Look at this one man. The guy down there sent it to me. He says he paid about 900 or something, but it's a shot gun. What do you think?" Madrigal gives Defendant the green light to purchase the gun, because Madrigal has "to replace the potato thrower. I need another one." Defendant then sends Madrigal a picture of more guns:

| 11/17/2022 | 5:40:43 AM | Ricardo Orizaba | Benjamin Madrigal-Birrueta | |
|---|---|---|---|---|
| | | | |  |

Defendant has a long-term drug buyer-seller relationship with the person selling the guns. Defendant sells "water" (methamphetamine) and "boat" (fentanyl) to the gun seller. Defendant negotiates on behalf of Madrigal to purchase weapons, first for "bills" (money), and then for a "barco" (1,000 fentanyl pills). Defendant keeps Madrigal apprised every step of the way.

- On October 26, 2022, Mario Castaneda pulled drug packages out of an SUV and gave them to Defendant. Defendant then placed the drug packages in his car and drove away. Gov. Exhs. 08-001 to 08-062.

- Defendant sold fentanyl pills to desperate buyers, and had no sympathy for his buyer's addiction.[1] Gov. Ex. 05-004.

- On February 8, 2023, agents found the following in Defendant's room:
    o 3 bags of heroin (1,604 grams);
    o 11,023 fentanyl pills;

---

[1] Buyer:     You don't know what this shit does or feel like so fuck you on that I'll be by in a few mins to get the 20 fucking pills then man. I've been shot 3 times, stabbed once and tore up by a police dog getting dope sick hurts damn near as bad.

Defendant:   Bro not everything is on your time you can get fucked an burn this bridge you'll need me more then I need you cuz you couldn't Fucken wait
             Goodbye

Gov. Exh. 05-004 (p. 6).

- 6 bags of fentanyl powder (969 grams);
- Loaded and operable AR-15 rifle with a scope, propped next to the heroin and fentanyl pills;
- Body armor;
- A scale;
- A money counter; and
- Money bands.

Gov. Exhs. 26-003, 26-006 and 09-022 through 09-050.

- Det. Erik Horbatko testified that the seizure from Orizaba's bedroom was the third largest seizure of fentanyl pills in the Yakima area at the time. Tr. Transc. 834-835.

- Defendant's own brother, Leonardo Orizaba (Leo), testified that:
    - Everything in Defendant's room belonged to Defendant;
    - He knew his brother (Defendant) was a drug dealer;
    - Defendant's only job was dealing drugs;
    - Defendant had cameras installed around the outside of the house and on a pole camera in front of the house that Defendant monitored closely;
    - Madrigal and Defendant were "good friends;"
    - After Defendant was arrested, one of the first people that Leo contacted was Madrigal to assist the family to post bail for Defendant.
    - Defendant would disappear for days.
    - Defendant drove to Los Angeles.
    - Defendant drove to Seattle.

Tr. Transc. 1094-1095, 1108-1111, 1115-1121, 1123.

- When Defendant was arrested and his house searched. Others in the DTO were texting each other to stay away from Defendant's house and not call him. *See e.g.,* Gov. Exh. 04-015, 04-019 ("Don't call or anything buddy he got busted," followed by video of house drive-by).

Finally, the Court heard testimony from Julio Vargas, which put Defendant at the scene of both Murillo's and Hernandez's murder. Tr. Transc. 375-377, 419. Mario Castaneda put Defendant at the Ranch after Murillo's murder, Tr. Transc. 527-540, and driving into the Ranch as Castaneda was leaving, after Poninas put Hernandez's body into

the second hole in the ground. Tr. Transc. 541-545.[2] Vargas also testified that Defendant got rid of the gun that killed Murillo. Tr. Transc. 393-394, 420-421.

## II

## SENTENCING RECOMMENDATIONS AND ANALYSIS

### A.    The Advisory Guideline Calculations

The jury found the Defendant guilty of Conspiracy to Distribute over 1.5 kgs. of Methamphetamine, over 12 kgs. of Fentanyl and over 5 kgs. of Cocaine, and Possession of a Firearm in Furtherance of a Drug Trafficking Crime. Conviction on these two counts means a mandatory minimum floor of 15 years. The Guidelines calculations are as follows:

| | | |
|---|---|---|
| 1. | Base Offense Level [§ 2D1.1(c)(1)] | 38 |
| 2. | Firearms [§ 2D1.1(b)(1)] | +2 |
| 3. | Violence [§ 2D1.1(b)(2)] | +2 |
| 4. | Import Methamphetamine [§ 2D1.1(b)(5)] | +2 |
| 5. | Maintain Drug Premises [§ 2D1.1(b)(12)] | +2 |
| 6. | Livelihood [§ 2D1.1(b)(16)(E)] | +2 |
| 7. | Aggravating Role [§ 3B1.1] | +3 |
| | Total Offense Level | 51[3] |

18 USC Sec. 924(c) and U.S. Sentencing Guidelines (USSG) § 2K2.4(b) mandate that this conviction does not group and the Court should instead add five years to the sentence it would impose for the conspiracy to distribute count.

Base Offense Level (USSG §2D1.1(c)(1)): The PSR writer correctly calculated the Base Offense Level. USSG  §2D1.1 Commentary Application Note 2 instructs us to calculate the base offense level "based upon the quantity of the controlled substance

---

[2] The jury found the Defendant not guilty of threatening Mario Castaneda, accessory after the fact, and the related weapons charge. That does not mean that Castaneda's testimony should be disregarded in its entirety. Castaneda identified the exact locations of Cesar Murillo's and Maira Hernandez's bodies. Given the complete lack of markers, Castaneda must have seen them buried. Further, beyond the generalized allegations that Castaneda and Vargas were fabricating their testimony to curry favor with the Government, there was no evidence that Castaneda or Vargas had a personal animus against Defendant. As such, there is no reason to disbelieve them when they told this Court that Defendant was at the Ranch at or near the time when Murillo dnod Hernandez were murdered.

[3] The PSR writer correctly notes that the total offense level is capped at 43 under USSG Chapter 5, Part A, Commentary no.2.

involved." Further, Application Note 5 reads "If the offense involved both a substantive drug offense and a conspiracy, the total quantity involved shall be aggregated to determine the scale of the offense." Defendant was convicted of conspiracy to distribute methamphetamine, fentanyl and cocaine as part of a DTO from at least May 12, 2021 through April 4, 2023, and there is no evidence that he withdrew from the DTO. As such, he is liable for all of the drugs linked to that DTO, at least through his arrest on February 8, 2023.

Firearms (USSG §2D1.1(b)(1)): This Specific Offense Characteristic (SOC) applies "if a dangerous weapon was possessed" as part of the offense. Defendant focuses on the AK-47 underlying Count Five to argue that under USSG §2K2.4, Commentary Application Note 4(A), this SOC does not apply. However, the AK-47 is not the only firearm at issue. Seven guns were found in the house; Defendant is clearly buying and selling guns for the organization; and the organization maintained the Ranch with its arsenal of firearms, which Defendant also used as a member of the DTO.

Violence (USSG §2D1.1(b)(2)): The Court should apply this SOC if Defendant used violence and made credible threats of violence to further the drug distribution conspiracy. In addition to the testimony that Defendant was involved in the murder of Murillo and brought the shooter to and from the murder of Hernandez, Madrigal dispatched Defendant to the Ranch to "fuck [additional people] up and bury them" on November 24, 2022. He was also dispatched to Seattle to enforce payment of a drug debt.

Import Methamphetamine (USSG §2D1.1(b)(5)): This SOC applies if "the offense involved the importation of … methamphetamine." It is uncontested that the methamphetamine sold by this DTO came from Mexico.

Maintain Drug Premises (USSG § 2D1.1(b)(12)): The Court should apply this SOC. *See United States v. Tekola*, 169 F4th 947, 950-951 (9th Cir. 2026) (applying the enhancement where Defendant lived in the apartment, but also used it to store and sell drugs). "Tekola's apartment was the hub of his distribution network. It was where he stored his drugs and other tools of the drug-dealing trade, where he processed and recorded the

drugs he sold, and a default location where trusted customers picked up drugs. Of course, Tekola also conducted drug deals elsewhere, but that additional trafficking does not change the fact that his apartment was the equivalent of a home office for the illicit drug business he ran." *Id.* at 952. The same is true for Defendant. Defendant stored his drugs, maintained the tools of the trade to weigh and parse out his drugs (e.g., scale, gloves, money counter), kept his drugs safe with his guns, ammunition, magazines, body armor and cameras, sold his drugs, and stockpiled his drug money in his bedroom and in the safe in his front yard. Leo testified that Defendant had no other job and that any drugs found at the house belonged to Defendant. Further, there is no evidence that Defendant stowed his drugs anywhere other than his house.

Livelihood (USSG §2D1.1(b)(16)(E)): The Court should apply this SOC if Defendant received a role adjustment and "committed the offense as part of a pattern of criminal conduct engaged in as a livelihood." Leo Orizaba testified that drug dealing was Defendant's only job.

Role (USSG §3B1.1): This SOC applies if Defendant was a manager/supervisor and the criminal activity involved five or more participants or was otherwise extensive. As reflected in his texts with Madrigal and the amount of fentanyl and heroin found in his house, Defendant was higher up in the organization, coordinating the purchase of drugs and guns for the organization, negotiating prices, overseeing the assault of potential thieves, and reporting directly to Madrigal.

Zero Point Offender (USSG §4C1.1): Defendant is not eligible for the zero-point offender adjustment for multiple reasons: he used violence and credible threats in connection with this offense (USSG §4C1.1(a)(3)); the offense resulted in death (USSG §4C1.1(a)(4)); Defendant possessed, received, purchased, transported, transferred multiple firearms in connection with this offense (USSG §4C1.1(a)(7)); and the Defendant should receive a role adjustment (USSG §4C1.1(a)(10)).

Safety Valve (USSG §5C1.2): Defendant is not eligible for Safety Valve for many of the reasons that he is not eligible for a zero-point offender adjustment. He used violence

and credible threats in connection with this offense (USSG §5C1.2(a)(2)); the offense resulted in death (USSG §5C1.2(a)(3)); and Defendant should receive a role adjustment (USSG §5C1.2(a)(4)).

### B. Analysis of the § 3553(a) Factors

The United States' recommendation of a life sentence is well in line with the statutes of conviction and the Guidelines range. It is also warranted based upon consideration of the factors set forth in 18 U.S.C. § 3553(a). The § 3553(a) factors are relatively clear in this case. The nature and circumstances of the offense were solely mercenary and plainly horrendous. Defendant himself described his childhood as "good," although he did not have a stable home. *See* PSR ¶130. He was motivated by money and power and appears to have suffered no crisis of conscience for his actions or those of his co-Defendants. And Defendant has yet to express any form of remorse. He merely concedes that the drugs (not the guns) were his, and that he committed dangerous acts; he apologizes to his family; and he notes that the deaths "caused significant hardship on their families." *See* PSR ¶ 96 ("The defendant would like the Court to know that he takes full responsibility for the drugs in his house; he owned them and would like to apologize for the dangerous acts he committed. The defendant would also like to apologize to his family for what he has put them through. Further, as the Court has had the opportunity to witness, the victims' deaths caused significant hardship on their families.")

//
//
//
//
//
//
//
//
//

*Sentencing Memorandum*

12

*23CR1684-DMS (5)*

## IV

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court sentence Defendant to life imprisonment plus five years, with no term of supervised release to follow.

DATED:  May 21, 2026                      Respectfully submitted,

                                          ADAM GORDON
                                          United States Attorney

                                          /s/ *Alexandra F. Foster*
                                          ALEXANDRA F. FOSTER
                                          STEPHEN H. WONG
                                          Assistant United States Attorneys